**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION**

| | |
|---|---|
| **CHARLEY LUTHER,** individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>    v.<br><br>**PHARMERICA CORPORATION,**<br><br>                    Defendant. | Case No.    3:23CV-315-GNS<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

---

**CLASS ACTION COMPLAINT**

---

Plaintiff Charley Luther ("Plaintiff") brings this Class Action Complaint, individually and on behalf of all others similarly situated (the "Class Members"), against PharMerica Corporation ("Defendant" or "PharMerica") alleging as follows, based upon information and belief, investigation of counsel, and personal knowledge of Plaintiff.

**NATURE OF CASE**

1.      This class action arises out of the recent targeted cyberattack and data breach where unauthorized third-party criminals retrieved and exfiltrated personal data from PharMerica's network that resulted in unauthorized access to the highly-sensitive consumer data[1] of Plaintiff, and, according to PharMerica, at least 5,815,591 Class Members ("Data Breach").[2] After learning of the Data Breach, PharMerica waited nearly two months (or more) to notify affected individuals.

---

[1] PharMerica Healthcare, Inc's Sample Breach Notice, (June 8, 2023), https://apps.web.maine.gov/online/aeviewer/ME/40/08d6080b-afcf-4d02-ba20-24f639aaca61/7706ccf6-5b3e-4b8c-83f3-3a3852151b93/document.html.

[2] Office of the Maine Attorney General, Data Breach Notifications, https://apps.web.maine.gov/online/aeviewer/ME/40/08d6080b-afcf-4d02-ba20-24f639aaca61.shtml (last visited June 20, 2023).

2.     PharMerica is a national leader in pharmacy services, serving partners and patients in over 3,100 long-term care, senior living, IDD/behavioral health, home infusion, specialty pharmacy, and hospital management programs across all fifty states.[3]

3.     Information compromised in the Data Breach includes personally identifying information ("PII") and protected health information ("PHI") such as names, addresses, dates of birth, Social Security numbers, health insurance, and medication information (collectively, "PII and PHI" is "Private Information").

4.     Plaintiff brings this class action lawsuit individually and on behalf of those similarly situated to address Defendant's inadequate safeguarding of Plaintiff's and Class Members' Private Information that Defendant collected and maintained.

5.     Defendant maintained the Private Information in a negligent and/or reckless manner. In particular, the Private Information was maintained on Defendant's computer system and network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure Private Information from those risks left that Private Information in a vulnerable condition. In addition, PharMerica and its employees failed to properly monitor the computer network and IT systems that housed the Private Information.

6.     Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including opening new financial accounts and taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members'

_____

[3] PharMerica, *Who We Are*, https://pharmerica.com/who-we-are/ (last accessed May 18, 2023).

Private Information to target other phishing and hacking intrusions based on their individual health needs, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

7.      As a result of the Data Breach, Plaintiff and Class Members face a substantial risk of imminent and certainly impending harm. Plaintiff and Class Members have and will continue to suffer injuries associated with this risk, including but not limited to a loss of time, mitigation expenses, and anxiety over the misuse of their Private Information.

8.      Even those Class Members who have yet to experience identity theft have to spend time responding to the Data Breach and are at an immediate and heightened risk of all manners of identity theft as a direct and proximate result of the Data Breach. Plaintiff and Class Members have incurred, and will continue to incur, damages in the form of, among other things, identity theft, attempted identity theft, lost time and expenses mitigating harms, increased risk of harm, damaged credit, diminished value of Private Information, loss of privacy, and/or additional damages as described below.

9.      Accordingly, Plaintiff brings this action against Defendant seeking redress for its unlawful conduct, and asserting claims for: (i) negligence; (ii) breach of implied contract; (iii) unjust enrichment; (iv) breach of fiduciary duty; (v) bailment; (vi) violation of California's Confidentiality of Medical Information Act; (vii) violation of the California Consumer Privacy Act; and (viii) violations of California's Unfair Competition Law. Through these claims, Plaintiff seeks damages in an amount to be proven at trial, as well as injunctive and other equitable relief, including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

## THE PARTIES

10.    Plaintiff Charley Luther is a natural person, resident, and citizen of the State of California.

11.    Defendant obtained and continues to maintain the Private Information of Plaintiff and owed her a legal duty and obligation to protect her Private Information from unauthorized access and disclosure. Plaintiff's Private Information was compromised and disclosed as a result of Defendant's inadequate data security, which resulted in the Data Breach.

12.    Plaintiff recalls receiving a notice letter from Defendant Phamerica Corporation, stating that an unknown actor accessed and obtained certain files on the PharMerica's network containing Private Information between March 12-13, 2023.

### *Defendant PharMerica Healthcare, Inc.*

13.    Defendant PharMerica Corporation is a corporation incorporated in Delaware, with its headquarters in Louisville, Kentucky. PharMerica's principal place of business is 805 N. Whittington Pkwy Louisville, Kentucky 40222. Defendant is a citizen of the State of Kentucky.

## JURISDICTION AND VENUE

14.    This Court has original jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because Plaintiff and at least one member of the putative Class, as defined below, are citizens of a different state than Defendant PharMerica, there are more than 100 putative class members, and the amount in controversy exceeds $5 million exclusive of interest and costs.

15.    This Court has general personal jurisdiction over Defendant because Defendant maintains its principal place of business in Louisville, Kentucky; regularly conducts business in Kentucky; and has sufficient minimum contacts in Kentucky.

16.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## DEFENDANT'S BUSINESS

17.    PharMerica is a pharmacy services company that offers comphrensive pharmacy management services for skilled nursing, assisted living, and other long-term care settings. PharMerica partners with over 3,100 long-term care facilities, operates over 180 local pharmaces, and employs over 6,000 local professionals including pharmacist and nurse consultants.[4] PharMerica generates approximately $3.6 billion in yearly revenue.[5] PharMerica trades on the New York Stock Exchange under the stock symbol PMC.[6]

18.    PharMerica's core business provides pharmacy products and services to residents and patients in skilled nursing facilities, nursing centers, assisted living facilities, hospitals, and other long-term alternative care settings. PharMerica purchases, repackages, and dispenses prescription and non-prescription pharmaceuticals in accordance with physician orders and delivers such medication to healthcare facilities for administration to individual patients and residents.[7]

19.    Defendant's Privacy Policy, posted on its website, acknowledges that, as part of its business, it collects and stores the Private Information of patients, such as Plaintiff and Class

---

[4] PharMerica, Who We Are, https://pharmerica.com/who-we-are/ (last accessed May 18, 2023).
[5] ZoomInfo, PharMerica, https://www.zoominfo.com/c/pharmerica-corp/52806442 (last accessed May 18, 2023).
[6] MarketBeat, NYSE:PMC Pharmerica (PMC) Stock Forecast, Price & News, https://www.marketbeat.com/stocks/NYSE/PMC/#:~:text=Pharmerica%20trades%20on%20the %20New,the%20ticker%20symbol%20%22PMC.%22 (last accessed May 18, 2023).
[7] https://www.sec.gov/Archives/edgar/data/1388195/000138819517000004/form10k.htm

Members. "While you receive pharmacy services from us, we create records of the pharmacy services that we provide to you."[8]

20.     Defendant's Privacy Policy also acknowledges that PharMerica and entitites under common ownership or control of PharMerica Corporation are covered under the Health Insurance Portability and Accountability Act of 1996, as amended, and its implementing regulations ("HIPAA"), and HIPAA privacy rules.

21.     On its website, Defendant also offers "information about a recent Data Privacy Incident." In this notice, Defendant claims that "PharMerica is committed to maintaining the privacy and security of the information entrusted to it. . . [and] deeply regrets any inconvenience this incident may have caused. "[9]

22.     To obtain healthcare related pharmacy services, patients, like Plaintiff and Class Members, must provide their doctors or medical professionals or Defendant directly with highly sensitive Private Information. As part of its business, Defendant then compiles, stores, and maintains the Private Information it receives from patients and healthcare professionals who utilize Defendant's services. In its over 30 years of experience, Defendant has served thousands of individuals, indicating that it has created and maintains a massive repository of Private Information, creating a particularly lucrative target for data thieves looking to obtain, misuse, or sell patient data.

23.     On information and belief, in the ordinary course of its business of providing medical care and services, PharMerica maintains the Private Information of consumers, including

---

[8] PharMerica, Notice of Privacy Policy, https://pharmerica.com/privacy-policy/ (last accessed May 16, 2023).
[9] PharMerica, PharMerica Notifies Individuals of Privacy Incident, https://pharmerica.com/data-privacy-incident/(last accessed May 16, 2023).

but not limited to:

- Name, address, phone number and email address;

- Date of birth;

- Demographic information;

- Social Security number;

- Financial and/or payment information;

- Information relating to individual medical history;

- Information concerning an individual's doctor, nurse, or other medical providers;

- Medication information;

- Health insurance information;

- Other information that Defendant may deem necessary to provide services and care.

24.    Additionally, Defendant may receive Private Information from other individuals and/or organizations that are part of a patient's "circle of care," such as referring physicians, customers' other doctors, customers' health plan(s), close friends, and/or family members.

25.    Because of the highly sensitive and personal nature of the information Defendant acquires and stores with respect to patients and other individuals, PharMerica, upon information and belief, promises to, among other things: keep PHI private; comply with health care industry standards related to data security and Private Information, including HIPAA; inform consumers of its legal duties and comply with all federal and state laws protecting consumer Private Information; only use and release Private Information for reasons that relate to medical care and treatment; and provide adequate notice to individuals if their Private Information is disclosed without authorization.

26.     As a HIPAA covered business entity (*see infra*), PharMerica is required to implement adequate safeguards to prevent unauthorized use or disclosure of Private Information, including by implementing requirements of the HIPAA Security Rule and to report any unauthorized use or disclosure of Private Information, including incidents that constitute breaches of unsecured PHI as in the case of the Data Breach complained of herein.

27.     However, PharMerica did not maintain adequate security to protect its systems from infiltration by cybercriminals, and it waited nearly two months to publicly disclose the Data Breach.

28.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

29.     Defendant was in the best position to safeguard the most sensitive information that it obtained from Plaintiff and Class Members. Its unique position enabled it to collect some of the most sensitive information on Plaintiff and Class Members; accordingly, Defendant had a special relationship with Plaintiff and Class Members such that it should have safeguarded that data.

## PharMerica is a Covered Entity Subject to HIPAA

30.     PharMerica is a HIPAA covered entity that provides services to patients and healthcare and medical service providers. As a regular and necessary part of its business, PharMerica collects the highly sensitive Private Information of its and its clients' patients. PharMerica's clients—including over 3,100 long-term care, senior living, IDD/behavioral health, home infusion, specialty pharmacy, and hospital management programs—are Covered Entities under HIPAA. As a covered entity, PharMerica is required under federal and state law to maintain

the strictest confidentiality of the patient's Private Information that it acquires, receives, and collects, and PharMerica is further required to maintain sufficient safeguards to protect that Private Information from being accessed by unauthorized third parties.

31.    As a covered entity under HIPAA, PharMerica is required to ensure that it will implement adequate safeguards to prevent unauthorized use or disclosure of Private Information, including by implementing requirements of the HIPAA Security Rule and to report any unauthorized use or disclosure of Private Information, including incidents that constitute breaches of unsecured PHI as in the case of the Data Breach complained of herein.

32.    Due to the nature of PharMerica's business, which includes providing a range of medical technology services, including storing and maintaining electronic health records, PharMerica would be unable to engage in its regular business activities without collecting and aggregating Private Information that it knows and understands to be sensitive and confidential.

33.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, PharMerica assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

34.    Plaintiff and Class Members are or were patients, or are the executors or surviving spouses of patients, whose medical records and Private Information were maintained by, or who received health-related or other services from PharMerica and directly or indirectly entrusted PharMerica with their Private Information.

35.    Plaintiff and the Class Members relied on PharMerica to implement and follow adequate data security policies and protocols, to keep their Private Information confidential and securely maintained, to use such Private Information solely for business and health care purposes,

9

and to prevent the unauthorized disclosures of the Private Information. Plaintiff and Class Members reasonably expected that PharMerica would safeguard their highly sensitive information and keep that Private Information confidential.

36.    As described throughout this Complaint, PharMerica did not reasonably protect, secure, or store Plaintiff's and Class Members' Private Information prior to, during, or after the Data Breach, but rather, enacted unreasonable data security measures that it knew or should have known were insufficient to reasonably protect the highly sensitive information PharMerica maintained. Consequently, cybercriminals circumvented PharMerica's security measures, resulting in a significant data breach.

## THE DATA BREACH AND NOTICE LETTER

37.    According to the Notice Letter PharMerica provided to Plaintiff and Class Members, as well as to at least one State Attorney General, PharMerica was subject to a cybersecurity attack where unauthorized parties accessed Private Information on PharMerica's networks between March 12-13, 2023.[10]

38.    On March 14, 2023, PharMerica was alerted to unusual activity on its network. In response, PharMerica "began an internal investigation and engaged cybersecurity advisors" to conduct an investigation and "secure our computer systems."[11]

39.    Through its investigation, PharMerica determined that "an unknown third party accessed our computer systems" and that "certain personal information may have been obtained from our systems as a part of the incident."[12]

---

[10] *See* Notice Letter.
[11] See *id.*
[12] *See id.*

40.     According to the Notice Letter, on March 21, 2023, PharMerica confirmed that the affected information included individuals' "name, address, date of birth, Social Security number, medications and health insurance information."[13]

41.     PharMerica waited nearly a month from the date it learned of the Data Breach and the highly sensitive nature of the Private Information impacted to publicly disclose the data breach and notify affected individuals. This slow response occurred, despite the Notice Letter's admission that: "This notification was not delayed by law enforcement."[14]

42.     Although PharMerica claims, that "we have no reason to believe that anyone's information has been misused for the purpose of committing fraud or identity theft,"[15] according to news reports of the Data Breach, in April 2023, the ransomware group suspected to be responsible for the attack began "leaking personally identifiable information (PII) and protected health information (PHI) allegedly stolen from PharMerica."[16] While PharMerica made no mention of ransomware being used in the attack, in April 2023, ransomware operators, in addition to leaking PII and PHI allegedly stolen from PharMerica, told DataBreaches.net that they "encrypted almost the entire PharMerica infrastructure and that they had engaged in negotiations with the company."[17]

43.     In the aftermath of the Data Breach, PharMerica has reportedly "taken steps to reduce the risk of this type of incident from occurring in the future, including enhancing our

---

[13] *See id.*

[14] *See id.*

[15] *See id.*

[16] Ionut Arghire, PharMerica Discloses Data Breach Impacting 5.8 Million Individuals, SecurityWeek (May 14, 2023), https://www.securityweek.com/pharmerica-discloses-data-breach-impacting-5-8-million-individuals/amp/.

[17] *Id.*

technical security measures." [18] Defendant admits additional security was required, but there is no indication whether these steps are adequate to protect Plaintiff's and Class Members' Private Information going forward.

44.    In the Notice Letter Defendant recommended that Plaintiff and Class Members take steps "to request a copy of the above-referenced individual's credit report," and encouraged executors or surviving spouses to contact the national credit reporting agencies to notify them of the situation.[19]

45.    According to PharMerica, Plaintiff's and Class Members' Private Information was exfiltrated and stolen in the attack.

46.    PharMerica's accessed systems contained Private Information that was accessible, unencrypted, unprotected, and vulnerable for acquisition and/or exfiltration by the unauthorized actor.

47.    As a HIPAA covered business entity that collects, creates, and maintains significant volumes of Private Information, the targeted attack was a foreseeable risk which PharMerica was aware of and knew it had a duty to guard against. This is particularly true because the targeted attack was a ransomware attack.[20] It is well-known that healthcare businesses such as Defendant, which collect and store the confidential and sensitive PII/PHI of millions of individuals, are frequently targeted by cyberattacks. Further, cyberattacks are highly preventable through the

---

[18] *See Notice Letter.*

[19] *See* PharMerica Healthcare, Inc's Sample Breach Notice, (June 8, 2023), https://apps.web.maine.gov/online/aeviewer/ME/40/08d6080b-afcf-4d02-ba20-24f639aaca61/7706ccf6-5b3e-4b8c-83f3-3a3852151b93/document.html.

[20] *See* Ionut Arghire, PharMerica Discloses Data Breach Impacting 5.8 Million Individuals, SecurityWeek (May 14, 2023), https://www.securityweek.com/pharmerica-discloses-data-breach-impacting-5-8-million-individuals/amp/.

implementation of reasonable and adequate cybersecurity safeguards, including proper employee cybersecurity training.

48.    The targeted cyberattack was expressly designed to gain access to and exfiltrate private and confidential data, including (among other things) the Private Information of patients, like Plaintiff and Class Members.

49.    Defendant had obligations created by HIPAA, contract, industry standards, common law, and its own promises and representations made to Plaintiff and Class Members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

50.    Plaintiff and Class Members provided their Private Information to PharMerica with the reasonable expectation and mutual understanding that PharMerica would comply with its obligations to keep such information confidential and secure from unauthorized access.

51.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, PharMerica assumed legal and equitable duties and knew, or should have known, that it was responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

52.    Due to PharMerica's inadequate security measures and its delayed notice to victims, Plaintiff and Class Members now face a present, immediate, and ongoing risk of fraud and identity theft that they will have to deal with for the rest of their lives.

### The Data Breach was a Foreseeable Risk of which Defendant was on Notice

53.    As a covered entity handling medical patient data, PharMerica's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the healthcare industry and other industries holding significant amounts of PII and

PHI preceding the date of the breach.

54.     At all relevant times, PharMerica knew, or should have known that Plaintiff's and Class Members' Private Information was a target for malicious actors. Despite such knowledge, PharMerica failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class Members' Private Information from cyberattacks that PharMerica should have anticipated and guarded against.

55.     In light of recent high profile data breaches at other health care providers, Defendant knew or should have known that their electronic records and consumers' Private Information would be targeted by cybercriminals and ransomware attack groups.

56.     Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2022 report, the healthcare compliance company, Protenus, found that there were 905 medical data breaches in 2021, leaving over 50 million patient records exposed for 700 of the 2021 incidents. This is an increase from the 758 medical data breaches that Protenus compiled in 2020.[21]

57.     The healthcare sector suffered about 337 breaches in the first half of 2022 alone, according to Fortified Health Security's mid-year report released in July. The percentage of healthcare breaches attributed to malicious activity rose more than five percentage points in the first six months of 2022 to account for nearly 80 percent of all reported incidents.[22]

58.     In light of recent high profile cybersecurity incidents at other healthcare partner

---

[21] *2022 Breach Barometer*, PROTENUS, https://blog.protenus.com/key-takeaways-from- the-2022-breach-barometer (last visited May. 7, 2023).
[22] Jill McKeon, *Health Sector Suffered 337 Healthcare Data Breaches in First Half of Year*, Cybersecurity News (July 19, 2022), available at: https://healthitsecurity.com/news/health-sector-suffered-337-healthcare-data-breaches-in-first-half-of-year (last visited May. 7, 2023).

and provider companies, including American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), and BJC Health System (286,876 patients, March 2020), Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

59.     Indeed, cyberattacks against the healthcare industry have been common for over eleven years with the FBI warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII." The FBI further warned that that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[23]

60.     PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[24] A cybercriminal who steals a person's PHI can end up with as many as "seven to 10 personal identifying characteristics of an individual."[25] A study by Experian found that the "average total cost" of medical identity theft is "about $20,000" per incident in 2010, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare

---

[23] Gordon M. Snow, *Statement before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit*, FBI (Sept. 14, 2011), https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector.
[24] *See* Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH MAGAZINE (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.") (last visited May. 7, 2023).
[25] *Id.*

they did not receive in order to restore coverage.[26]

61.     Cyberattacks on medical systems, like Defendant's, have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive. . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[27]

62.     According to an article in the HIPAA Journal posted on October 14, 2022, cybercriminals hack into medical practices for their "highly prized" medical records. "[T]he number of data breaches reported by HIPAA-regulated entities continues to increase every year. 2021 saw 714 data breaches of 500 or more records reported to the [HHS' Office for Civil Rights] OCR – an 11% increase from the previous year. Almost three-quarters of those breaches were classified as hacking/IT incidents." [28]

63.     Healthcare organizations are easy targets because "even relatively small healthcare providers may store the records of hundreds of thousands of patients. The stored data is highly detailed, including demographic data, Social Security numbers, financial information, health insurance information, and medical and clinical data, and that information can be easily monetized."[29] In this case, PharMerica stored the records of *millions* of patients.

64.     Private Information, like that stolen from PharMerica, are "often processed and

---

[26] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/.
[27] *FBI, Secret Service Warn of Targeted*, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.
[28] The HIPAA Journal, *Editorial: Why Do Criminals Target Medical Records* (Oct. 14, 2022), https://www.hipaajournal.com/why-do-criminals-target-medical-records.
[29] See *id.*

packaged with other illegally obtained data to create full record sets (fullz) that contain extensive information on individuals, often in intimate detail." The record sets are then sold on dark web sites to other criminals and "allows an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[30]

65.     Cybercriminals are also maintaining encrypted information on individuals to sell in "fullz" records because that information can be foreseeably decrypted in the future.

66.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' Private Information has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

67.     In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in the past year.[31]

68.     PharMerica was on notice that the FBI has recently been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[32]

---

[30] See *id*.

[31] *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack, Security Magazine* (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack.

[32] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, REUTERS (Aug. 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idINKBN0GK24U20140820 (last visited May 7, 2023).

69.     The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[33]

70.     As implied by the above AMA quote, stolen Private Information can be used to interrupt important medical services. This is an imminent and certainly impending risk for Plaintiff and Class Members.

71.     The U.S. Department of Health and Human Services and the Office of Consumer Rights urges the use of encryption of data containing sensitive personal information. As far back as 2014, the Department fined two healthcare companies approximately two million dollars for failing to encrypt laptops containing sensitive personal information. In announcing the fines, Susan McAndrew, formerly OCR's deputy director of health information privacy, stated in 2014 that "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[34]

72.     As a HIPAA covered entity, PharMerica should have known about its data security vulnerabilities and implemented enhanced and adequate protection, particularly given the nature of the Private Information stored in its unprotected files.

---

[33] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, AM. MED.ASS'N (Oct 4, 2019), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals.

[34] Susan D. Hall, *OCR levies $2 million in HIPAA fines for stolen laptops*, Fierce Healthcare (Apr. 23, 2014), https://www.fiercehealthcare.com/it/ocr-levies-2-million-hipaa-fines-for-stolen-laptops.

## Defendant Fails to Comply with FTC Guidelines

73.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should factor into all business decision-making.

74.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[35] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and, have a response plan ready in the event of a breach.[36]

75.     The FTC further recommends that companies not maintain PII longer than necessary for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

76.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and

---

[35] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (Oct. 2016), *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.
[36] *Id*.

appropriate measures to protect against unauthorized access to confidential consumer data as an

unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15

U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take

to meet their data security obligations.

77.     These FTC enforcement actions include actions against healthcare providers and

partners like Defendant. *See, e.g.*, *In the Matter of LabMD, Inc., A Corp,* 2016-2 Trade Cas. (CCH)

¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that

LabMD's data security practices were unreasonable and constitute an unfair act or practice in

violation of Section 5 of the FTC Act.")

78.     Defendant failed to properly implement basic data security practices.

79.     Defendant's failure to employ reasonable and appropriate measures to protect

against unauthorized access to patients' Private Information constitutes an unfair act or practice

prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

80.     Defendant was at all times fully aware of its obligation to protect the Private

Information of customers and patients. Defendant was also aware of the significant repercussions

that would result from its failure to do so.

**Defendant Fails to Comply with Industry Standards**

81.     As shown above, experts studying cybersecurity routinely identify healthcare

providers and partners as being particularly vulnerable to cyberattacks because of the value of the

Private Information which they collect and maintain.

82.     Several best practices have been identified that at a minimum should be

implemented by healthcare service providers like Defendant, including but not limited to;

educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus,

and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

83.    Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

84.    On information and belief, Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

85.    These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards, thereby opening the door to the cyber incident and causing the data breach.

**Defendant's Conduct Violates HIPAA Obligations to Safeguard Private Information**

86.    As a pharmacy, and by handing medical patient data, PharMerica is, and so acknowledges that it is, a covered entity under HIPAA (45 C.F.R. § 160.103) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

21

87.    HIPAA requires covered entities to protect against reasonably anticipated threats to the security of sensitive patient health information.

88.    PharMerica is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

89.    HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information that is kept or transferred in electronic form.

90.    HIPAA covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

91.    Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PII like the data Defendant left unguarded. The HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.306(a)(1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D), and 45 C.F.R. § 164.530(b).

92.    A Data Breach such as the one Defendant experienced, is considered a breach under the HIPAA Rules because there is an access of PHI not permitted under the HIPAA Privacy Rule:

> A breach under the HIPAA Rules is defined as, "...the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." See 45 C.F.R. 164.40

93.     The Data Breach resulted from a combination of insufficiencies that demonstrate PharMerica failed to comply with safeguards mandated by HIPAA regulations.

### Cyberattacks and Data Breaches Cause Disruption and Put Consumers at an Increased Risk of Fraud and Identity Theft

94.     Cyberattacks and data breaches at health care companies and pharmacies like Defendant are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

95.     Researchers have found that among medical service providers that experience a data security incident, the death rate among patients increased in the months and years after the attack.[37]

96.     Researchers have further found that at medical service providers that experienced a data security incident, the incident was associated with deterioration in timeliness and patient outcomes, generally.[38]

97.     The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft face "substantial costs and time to repair the damage to their good name and credit record."[39]

98.     That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal PII is to monetize it. They

---

[37] *See* Nsikan Akpan, *Ransomware and Data Breaches Linked to Uptick in Fatal Heart Attacks*, PBS (Oct. 24, 2019), https://www.pbs.org/newshour/science/ransomware-and-other-data-breaches-linked-to-uptick-in-fatal-heart-attacks.

[38] *See* Sung J. Choi et al., *Data Breach Remediation Efforts and Their Implications for Hospital Quality*, 54 Health Services Research 971, 971-980 (2019), *available at* https://onlinelibrary.wiley.com/doi/full/10.1111/1475-6773.13203.

[39] *See* U.S. Gov. Accounting Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), *available at* https://www.gao.gov/new.items/d07737.pdf.

do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

99.    The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[40]

100.    Identity thieves use stolen Private Information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

101.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name

---

[40] *See IdentityTheft.gov*, Federal Trade Commission, https://www.identitytheft.gov/Steps (last visited May 7, 2023).

and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

102.    Moreover, theft of Private Information is also gravely serious because Private Information is an extremely valuable property right.[41]

103.    Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

104.    It must also be noted there may be a substantial time lag—measured in years— between when harm occurs and when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used.

105.    According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

---

[41] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

*See* GAO Report, at p. 29.

106.    Private Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

107.    There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future. Indeed, a recent SecurityWeek report describes that a ransomware group already "started leaking personally identifiable information (PII) and protected health information (PHI) allegedly stolen from PharMerica" in April 2023.[42]

108.    Thus, Plaintiff and Class Members must vigilantly monitor their financial and medical accounts, or the accounts of deceased individuals for whom Class Members are the executors or surviving spouses, for many years to come.

109.    Private Information can sell for as much as $363 per record according to the Infosec Institute.[43] Private Information is particularly valuable because criminals can use it to target victims with frauds and scams. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

110.    For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[44] Such fraud

---

[42] *See* Ionut Arghire, *PharMerica Discloses Data Breach Impacting 5.8 Million Individuals*, SecurityWeek (May 14, 2023), https://www.securityweek.com/pharmerica-discloses-data-breach-impacting-5-8-million-individuals/amp/.
[43] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.
[44] *Identity Theft and Your Social Security Number*, Social Security Administration (July 2021),

may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[45] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

111.    Moreover, it is not an easy task to change or cancel a stolen Social Security number.

112.    An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[46]

113.    This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[47]

114.    Medical information is especially valuable to identity thieves.

---

*available at* https://www.ssa.gov/pubs/EN-05-10064.pdf.

[45] *Id*.

[46] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[47] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

115.    Theft of PHI, in particular, is gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[48]

116.    Drug manufacturers, medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase PHI on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

117.    Because of the value of its collected and stored data, the medical industry has experienced disproportionally higher numbers of data theft events than other industries.

118.    For this reason, Defendant knew or should have known about these dangers and strengthened its data and email handling systems accordingly. Defendant was on notice of the substantial and foreseeable risk of harm from a data breach, yet Defendant failed to properly prepare for that risk.

## DEFENDANT'S DATA BREACH

119.    Defendant breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

      a.    Failing to maintain an adequate data security system to reduce the risk of

---

[48] *See* Federal Trade Commission, *Medical Identity Theft*, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited Apr. 6, 2023).

data breaches and cyber-attacks;

b.    Failing to adequately protect patients' and customers' Private Information;

c.    Failing to properly monitor its own data security systems for existing intrusions;

d.    Failing to ensure that its vendors with access to its computer systems and data employed reasonable security procedures;

e.    Failing to train its employees in the proper handling of emails containing Private Information and maintain adequate email security practices;

f.    Failing to ensure the confidentiality and integrity of electronic PHI it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

g.    Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

h.    Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

i.    Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

j.    Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

k.     Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

l.     Failing to ensure compliance with HIPAA security standard rules by its workforces in violation of 45 C.F.R. § 164.306(a)(4);

m.     Failing to train all members of its workforces effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of its workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b);

n.     Failing to render the electronic Private Information it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR § 164.304's definition of "encryption");

o.     Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

p.     Failing to adhere to industry standards for cybersecurity as discussed above; and

q.     Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Private Information.

120.     Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class

Members' Private Information by allowing cyberthieves to access PharMerica's computer network and systems for multiple days which contained unsecured and unencrypted Private Information.

121.    Accordingly, as outlined below, Plaintiff and Class Members now face an increased risk of fraud and identity theft. In addition, Plaintiff and the Class Members also lost the benefit of the bargain they made with Defendant.

**Plaintiff's and Class Members' Damages**

122.    Given the sensitivity of the Private Information involved in this Data Breach, Plaintiff and Class Members have all suffered damages and will face a substantial risk of additional injuries for years to come, if not the rest of their lives. Defendant has not demonstrated any efforts to prevent additional harm from befalling Plaintiff and Class Members as a result of the Data Breach.

123.    Plaintiff and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

124.    Plaintiff's and Class Members' names, dates of birth, addresses, Social Security Numbers, health insurance, and medication information were all compromised in the Data Breach and are now in the hands of the cybercriminals who accessed Defendant's computer system(s), and who have already begun leaking this Private Information.[49]

125.    Since being notified of the Data Breach, Plaintiff has spent time dealing with the impact of the Data Breach, valuable time Plaintiff otherwise would have spent on other activities,

---

[49] *See* Ionut Arghire, PharMerica Discloses Data Breach Impacting 5.8 Million Individuals, SecurityWeek (May 14, 2023), https://www.securityweek.com/pharmerica-discloses-data-breach-impacting-5-8-million-individuals/amp/.

including but not limited to work and/or recreation.

126.    Due to the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. This includes changing passwords, cancelling credit and debit cards, and monitoring her accounts for fraudulent activity.

127.    Plaintiff's and Class Members' Private Information was compromised as a direct and proximate result of the Data Breach.

128.    As a direct and proximate result of Defendant's conduct, Plaintiff's and Class Members have been placed at a present, imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

129.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to spend time dealing with the effects of the Data Breach.

130.    Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

131.    Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on Plaintiff's and Class Members' Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

132.    Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

133.    Plaintiff and Class Members also suffered a loss of value of their Private

Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

134.    Plaintiff and Class Members were also damaged via benefit-of-the-bargain damages. Plaintiff and Class Members overpaid for a service that was intended to be accompanied by adequate data security that complied with industry standards but was not. Part of the price Plaintiff and Class Members paid to Defendant and/or Defendant's healthcare partners was intended to be used by Defendant to fund adequate security of its computer system(s) and Plaintiff's and Class Members' Private Information. Thus, Plaintiff and Class Members did not get what they paid for and agreed to.

135.    Plaintiff and Class Members have spent and will continue to spend significant amounts of time monitoring their accounts and sensitive information for misuse.

136.    Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

> a.  Reviewing and monitoring sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;
>
> b.  Purchasing credit monitoring and identity theft prevention;
>
> c.  Placing "freezes" and "alerts" with reporting agencies;
>
> d.  Spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;
>
> e.  Contacting financial institutions and closing or modifying financial

accounts; and

f.    Closely reviewing and monitoring Social Security Number, medical insurance accounts, bank accounts, and credit reports for unauthorized activity for years to come.

137.    Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online and that access to such data is password protected.

138.    Further, as a result of Defendant's conduct, Plaintiff and Class Members are forced to live with the anxiety that their Private Information—which contains the most intimate details about a person's life, including what ailments they suffer, whether physical or mental—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

139.    As a direct and proximate result of Defendant's actions and inactions, Plaintiff and Class Members have suffered anxiety, emotional distress, loss of time, loss of privacy, and are at an increased risk of future harm.

**Plaintiff's Experience**

140.    Plaintiff never provided her Private Information to PharMerica Healthcare directly.

141.    According to the Data Breach Notice Letter Plaintiff received, PharMerica Healthcare acquired and maintained Plaintiff's Private Information from one of Plaintiff's doctors and/or medical professionals.

142.    Upon information and belief, Plaintiff was presented with standard forms to

34

complete prior to receiving medical services that required her PII and PHI. Upon information and belief, Defendant received and maintains the information Plaintiff was required to provide to her doctors or medical professionals. Plaintiff also believes she was presented with standard HIPAA privacy notices before disclosing her Private Information to their medical provider(s).

143.    Plaintiff is very careful with her Private Information. She stores any documents containing her Private Information in a safe and secure location. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

144.    Following the Data Breach, someone attempted to make charges on Plaintiff's debit card without authorization. The bank reversed the charge, closed her debit card account and issued her a new debit card. Plaintiff spent spent several hours addressing the incident. Additionally, following the Data Breach, Plaintiff received a suspicious phishing call from someone posing as her bank. The caller had Private Information about her. Plaintiff spent several hours addressing the incident, and had her debit card reissued.

145.    As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach after receiving the data breach notification letter, including but not limited to researching the Data Breach, reviewing debit card and financial account statements, and monitoring her credit.

146.    Plaintiff was forced to spend multiple hours attempting to mitigate the effects of the Data Breach. She will continue to spend valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. This is time that is lost forever and cannot be recaptured.

147.    Plaintiff suffered actual injury and damages from having her Private Information

compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her Private Information, a form of intangible property that PharMerica Healthcare obtained from Plaintiff and/or Plaintiff's doctors and medical professionals; (b) violation of her privacy rights; (c) the theft of her Private Information; (d) loss of time; (e) imminent and impending injury arising from the increased risk of identity theft and fraud; (f) failure to receive the benefit of her bargain; and (g) nominal and statutory damages.

148.    Plaintiff has also suffered emotional distress that is proportional to the risk of harm and loss of privacy caused by the theft of her Private Information, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using her Private Information for purposes of identity theft and fraud. Plaintiff has also suffered anxiety about unauthorized parties viewing, using, and/or publishing information related to her Social Security number, medical records, and prescriptions.

149.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff will continue to be at present, imminent, and continued increased risk of identity theft and fraud in perpetuity.

150.    Plaintiff has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

151.    Plaintiff also has a continuing interest in ensuring that any additional Private Information which Defendant collects is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

152.    Plaintiff brings this action against PharMerica individually and on behalf of all

other persons similarly situated ("the Class").

153.    Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> **All persons or, if minors, their parents or guardians, or, if deceased, their executors or surviving spouses, who PharMerica identified as being among those individuals impacted by the Data Breach, including all who were sent a notice of the Data Breach (the "Nationwide Class").**

154.    Plaintiff also proposes to represent a state subclass, defined as follows and subject to amendment as appropriate:

> **All California residents or, if minors, their parents or guardians, or, if deceased, their executors or surviving spouses, who PharMerica identified as being among those individuals impacted by the Data Breach, including all who were sent a notice of the Data Breach (the "California Subclass").**

155.    Excluded from the Classes are Defendant's officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and Members of their staff.

156.    Plaintiff reserves the right to amend or modify the Class definitions or create additional subclasses as this case progresses.

157.    <u>Numerosity</u>. The Members of the Classes are so numerous that joinder of all of them is impracticable. Defendant disclosed to the Maine Attorney General that the Private Information of approximately 5,815,591 Class Members was compromised in the Data Breach.

158.    <u>Commonality</u>. There are questions of law and fact common to the Classes, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

> a.    Whether Defendant unlawfully used, maintained, lost, or disclosed

37

Plaintiff's and Class Members' Private Information;

b. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations including, e.g., HIPAA;

d. Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e. Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f. Whether Defendant breached its duty to Class Members to safeguard their Private Information;

g. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

h. Whether Defendant should have discovered the Data Breach sooner;

i. Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j. Whether Defendant's conduct was negligent;

k. Whether Defendant breach implied contracts with Plaintiff and Class Members;

l. Whether Defendant was unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiff and Class Members;

m.  Whether Defendant failed to provide notice of the Data Breach in a timely manner, and;

n.  Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

159.  <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's information, like that of every other Class Member, was compromised in the Data Breach.

160.  <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

161.  <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the data of Plaintiff and Class Members was stored on the same computer system and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

162.  <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for

Defendant. In contrast, to conduct this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

163.    Defendant has acted on grounds that apply generally to the Classes as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

164.    Likewise, particular issues under Rule 42(d)(l) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

        a.  Whether Defendant failed to timely notify the public of the Data Breach;

        b.  Whether Defendant owed a legal duty to Plaintiff and the Classes to exercise due care in collecting, storing, and safeguarding their Private Information;

        c.  Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

        d.  Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

        e.  Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

        f.  Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

165.     Finally, all members of the proposed Classes are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## CLAIMS FOR RELIEF

### COUNT I
### Negligence
### (*On Behalf of Plaintiff and the Nationwide Class*)

166.     Plaintiff re-alleges and incorporates by reference paragraphs 1–165 as if fully set forth herein.

167.     By collecting and storing the Private Information of Plaintiff and Class Members, in its computer system and network, and sharing it and using it for commercial gain, Defendant owed a duty of care to use reasonable means to secure and safeguard its computer system—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

168.     Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

169.     Plaintiff and Class Members are a well-defined, foreseeable, and probable group of patients that Defendant was aware, or should have been aware, could be injured by inadequate data security measures.

170.     Defendant's duty of care to use reasonable security measures arose as a result of

41

the special relationship that existed between Defendant and consumers, which is recognized by laws and regulations including but not limited to HIPAA, the FTC Act, and common law. Defendant was in a superior position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

171.    Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all of the medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

172.    In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

173.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

174.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

      a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

      b.    Failing to adequately monitor the security of its networks and systems;

c.  Failing to ensure that its email system had plans in place to maintain reasonable data security safeguards;

d.  Failing to have in place mitigation policies and procedures;

e.  Allowing unauthorized access to Class Members' Private Information;

f.  Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

g.  Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

175.    Plaintiff and Class Members have no ability to protect their Private Information that was or remains in Defendant's possession.

176.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Furthermore, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

177.    It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members. In addition, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

178.    Defendant's conduct was grossly negligent and departed from reasonable standards of care, including but not limited to, failing to adequately protect the Private Information and failing to provide Plaintiff and Class Members with timely notice that their sensitive Private Information had been compromised.

179.    Neither Plaintiff nor Class Members contributed to the Data Breach and subsequent misuse of their Private Information as described in this Complaint.

180.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.,* (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

181.    The injury and harm Plaintiff and Class Members suffered was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that it was failing to meet its duties, and that Defendant's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

182.    As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory, consequential, nominal, and other damages as appropriate and ordered by the Court in an amount to be proven at trial.

### COUNT II
**Breach of Implied Contract**
*(On behalf of the Plaintiff and the Nationwide Class)*

183.    Plaintiff re-alleges and incorporates by reference paragraphs 1–165 as if fully set forth herein.

184.    Defendant acquired and maintained the Private Information of Plaintiff and the Class that it received either directly or from its healthcare provider customers.

185.    When Plaintiff and Class Members paid money and provided their Private Information to their doctors and/or healthcare providers, either directly or indirectly, in exchange for goods or services, they entered into implied contracts with their doctors and/or healthcare

professionals, their business associates, and pharmacies, including Defendant.

186.    Plaintiff and Class Members entered into implied contracts with Defendant under which Defendant agreed to safeguard and protect such information and to timely and accurately notify Plaintiff and Class Members that their information had been breached and compromised.

187.    Plaintiff and the Class were required to deliver their Private Information to Defendant as part of the process of obtaining services provided by Defendant. Plaintiff and Class Members paid money, or money was paid on their behalf, to Defendant in exchange for services.

188.    Defendant PharMerica solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant, or, alternatively, provided Plaintiff's and Class Members' information to doctors or other healthcare professionals, who then provided to Defendant.

189.    Defendant accepted possession of Plaintiff's and Class Members' Private Information for the purpose of providing services or Plaintiff and Class Members.

190.    In accepting such information and payment for services, Defendant entered into an implied contract with Plaintiff and the other Class Members whereby Defendant became obligated to reasonably safeguard Plaintiff's and the other Class Members' Private Information.

191.    Alternatively, Plaintiff and Class Members were the intended beneficiaries of data protection agreements entered into between Defendant and healthcare providers.

192.    In delivering their Private Information to Defendant and paying for healthcare services, Plaintiff and Class Members intended and understood that Defendant would adequately safeguard the data as part of that service.

193.    The implied promise of confidentiality includes consideration beyond those pre-

existing general duties owed under HIPAA or other state of federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines on data security.

194.    The implied promises include but are not limited to: (1) taking steps to ensure that any agents who are granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the information that is placed in the control of its agents is restricted and limited to achieve an authorized medical purpose; (3) restricting access to qualified and trained agents; (4) designing and implementing appropriate retention policies to protect the information against criminal data breaches; (5) applying or requiring proper encryption; (6) multifactor authentication for access; and (7) other steps to protect against foreseeable data breaches.

195.    Plaintiff and the Class Members would not have entrusted their Private Information to Defendant in the absence of such an implied contract.

196.    Had Defendant disclosed to Plaintiff and the Class (or their physicians) that it did not have adequate computer systems and security practices to secure sensitive data, Plaintiff and the other Class Members would not have provided their Private Information to Defendant (or their physicians to provide to Defendant).

197.    Defendant recognized that Plaintiff's and Class Members' Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiff and the other Class Members.

198.    Plaintiff and the other Class Members fully performed their obligations under the implied contracts with Defendant.

199.    Defendant breached the implied contract with Plaintiff and the other Class

Members by failing to take reasonable measures to safeguard their Private Information as described herein.

200.     As a direct and proximate result of Defendant's conduct, Plaintiff and the other Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

## COUNT III
### Unjust Enrichment
*(On Behalf of Plaintiff and the Nationwide Class)*

201.     Plaintiff re-alleges and incorporates by reference paragraphs 1–165 as if fully set forth herein.

202.     This count is pleaded in the alternative to breach of contract.

203.     Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including from money it makes based upon protecting Plaintiff's and Class Members' Private Information.

204.     There is a direct nexus between money paid to Defendant and the requirement that Defendant keep Plaintiff's and Class Members' Private Information confidential and protected.

205.     Plaintiff and Class Members paid Defendant and/or healthcare providers a certain sum of money, which was used to fund data security via contracts with Defendant.

206.     As such, a portion of the payments made by or on behalf of Plaintiff and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

207.     Protecting data from Plaintiff and the rest of the Class Members is integral to Defendant's business. Without their data, Defendant would be unable to provide the pharmacy services comprising Defendant's core business.

208.     Plaintiff's and Class Members' data has monetary value, and Plaintiff and Class

47

Members directly and indirectly conferred a monetary benefit on Defendant. They indirectly conferred a monetary benefit on Defendant by purchasing goods and/or services from entities that contracted with Defendant, and from which Defendant received compensation to protect certain data. Plaintiff and Class Members directly conferred a monetary benefit on Defendant by supplying Private Information, which has value, from which value Defendant derives its business value, and which should have been protected with adequate data security.

209.    Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

210.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

211.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

212.    Defendant acquired the monetary benefit and Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

213.    If Plaintiff and Class Members knew that Defendant had not secured their Private

Information, they would not have agreed to provide their Private Information to Defendant (or to their physician to provide to Defendant).

214. Plaintiff and Class Members have no adequate remedy at law.

215. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect Private Information in their continued possession; (vii) loss or privacy from the authorized access and exfiltration of their Private Information; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

216. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

217. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from

them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and
Class Members overpaid for Defendant's services.

## COUNT IV
### Bailment
*(On Behalf of Plaintiff and the Nationwide Class)*

218.    Plaintiff re-alleges and incorporates by reference paragraphs 1–165 as if set fully
forth herein.

219.    Plaintiff and Class Members provided Private Information to the Defendant—
either directly or through healthcare providers and their business associates—which Defendant
was under a duty to keep private and confidential.

220.    Plaintiff's and Class Members' Private Information is personal property, and it was
conveyed to Defendant for the certain purpose of keeping the information private and confidential.

221.    Plaintiff's and Class Members' Private Information has value, and is highly prized
by hackers and criminals. Defendant was aware of the risks it took when accepting the Private
Information for safeguarding, and assumed the risk voluntarily.

222.    Once Defendant accepted Plaintiff's and Class Members' Private Information, it
was in the exclusive possession of that information, and neither Plaintiff nor Class Members could
control that information once it was within the possession, custody, and control of Defendant.

223.    Defendant did not safeguard Plaintiff's or Class Members' Private Information
when it failed to adopt and enforce adequate security safeguards to prevent a known risk of a
cyberattack.

224.    Defendant's failure to safeguard Plaintiff's and Class Members' Private
Information resulted in that information being accessed or obtained by third-party cybercriminals.

225.    As a result of Defendant's failure to keep Plaintiff's and Class Members' Private Information secure, Plaintiff and Class Members suffered injury, for which compensation—including nominal damages and compensatory damages—are appropriate.

## COUNT V
### Breach of Fiduciary Duty
*(On Behalf of Plaintiff and the Nationwide Class)*

226.    Plaintiff re-alleges and incorporates by reference paragraphs 1–165 as if fully set forth herein.

227.    In light of the special relationship between Defendant and Plaintiff and Class Members, Defendant became a fiduciary by undertaking a guardianship of the Private Information to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant does store.

228.    Defendant had a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of its relationship with its patients, in particular, to keep secure their Private Information.

229.    Defendant breached its fiduciary duty to Plaintiff and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiff's and Class Members' Private Information.

230.    Defendant breached its fiduciary duty to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' Private Information.

231.    As a direct and proximate result of Defendant's breach of its fiduciary duty, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual

identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in their continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (vii) the diminished value of Defendant's services they received.

232.    As a direct and proximate result of Defendant's breach of its fiduciary duty, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

### COUNT VI
### Violation of the California Confidentiality of Medical Information Act ("CMIA")
### Cal. Civ. Code §§ 56, *et seq*.
### *(On Behalf of Plaintiff and the California Subclass)*

233.    Plaintiff re-alleges and incorporates by reference paragraphs 1–165 as if fully set forth herein.

234.    Plaintiff brings this claim on her own behalf and on behalf of the California Subclass.

235.    California's Confidential Medical Information Act was enacted to protect, among other things, the release of confidential medical information without proper authorization. See

Confidential Medical Information Act, Cal. Civ. Code §§ 56, et seq. ("CMIA"). To that end, the CMIA prohibits entities from negligently disclosing or releasing any person's confidential medical information. See Cal. Civ. Code § 56.36 (2013).

236.    The CMIA also requires that an entity, such as Defendant, that "creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein." Civ. Code § 56.101(a).

237.    Section 56.10(a) of the California Civil Code provides that "[a] provider of health care, health care service plan, or contractor shall not disclose medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization[.]"

238.    Defendant is a "provider of healtcare" within the meaning of Civil Code § 56.05 and .06, and maintained and continues to maintain "medical information," within the meaning of Civil Code § 56.05(j), for "patients" of Defendant, within the meaning of Civil Code § 56.05(k).

239.    Plaintiff and California Subclass members are "patients" within the meaning of Civil Code § 56.05(k) and are "endanger[ed]" within the meaning of Civil Code § 56.05(e) because Plaintiff and California Subclass members fear that disclosure of their medical information could subject them to harassment or abuse.

240.    Plaintiff and California Subclass members, as patients, had their individually identifiable "medical information," within the meaning of Civil Code § 56.05(j), created, maintained, preserved, and stored on Defendant's computer network at the time of the breach.

241.    Defendant, through inadequate security, allowed unauthorized third-party access to Plaintiff's and California Subclass members' medical information, without the prior written authorization of Plaintiff and California Subclass members, as required by Civil Code § 56.10 of

the CMIA.

242.    In violation of Civil Code § 56.10(a), Defendant disclosed Plaintiff's and California Subclass members' medical information without first obtaining an authorization. Plaintiff's and California Subclass members' medical information was viewed by unauthorized individuals as a direct and proximate result of Defendant's violation of Civil Code § 56.10(a).

243.    In violation of Civil Code § 56.10(e), Defendant further disclosed Plaintiff's and California Subclass members' medical information to persons or entities not engaged in providing direct health care services to Plaintiff or California Subclass members, or to their providers of health care or health care service plans or their insurers or self-insured employers.

244.    Defendant violated Civil Code § 56.101 of the CMIA through its willful and knowing failure to maintain and preserve the confidentiality of the medical information of Plaintiff and the California Subclass. Defendant's conduct with respect to the disclosure of confidential medical information was willful and knowing because Defendant designed and implemented the computer network and security practices that gave rise to the Data Breach.

245.    In violation of Civil Code § 56.101(a), Defendant created, maintained, preserved, stored, abandoned, destroyed, or disposed of Plaintiff's and California Subclass members' medical information in a manner that failed to preserve and breached the confidentiality of the information contained therein. Plaintiff's and California Subclass members' medical information was viewed by unauthorized individuals as a direct and proximate result of Defendant's violation of Civil Code § 56.101(a).

246.    In violation of Civil Code § 56.101(a), Defendant negligently created, maintained, preserved, stored, abandoned, destroyed, or disposed of Plaintiff's and California Subclass members' medical information. Plaintiff's and California Subclass members' medical information

was viewed by unauthorized individuals as a direct and proximate result of Defendant's violation of Civil Code § 56.101(a).

247.    Plaintiff's and California Subclass members' medical information that was the subject of the Data Breach included "electronic medical records" or "electronic health records" as referenced by Civil Code § 56.101(c) and defined by 42 U.S.C. § 17921(5).

248.    In violation of Civil Code § 56.101(b)(1)(A), Defendant's electronic health record system or electronic medical record system failed to protect and preserve the integrity of electronic medical information. Plaintiff's and California Subclass members' medical information was viewed by unauthorized individuals as a direct and proximate result of Defendant's violation of Civil Code § 56.101(b)(1)(A).

249.    Defendant violated Civil Code § 56.36 of the CMIA through its failure to maintain and preserve the confidentiality of the medical information of Plaintiff and the California Subclass.

250.    As a result of Defendant's above-described conduct, Plaintiff and California Subclass members have suffered damages from the unauthorized disclosure and release of their individual identifiable "medical information" made unlawful by Civil Code §§ 56.10, 56.101, 56.36.

251.    As a direct and proximate result of Defendant's above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, and violation of the CMIA, Plaintiff and California Subclass members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, inter alia, (i) an imminent, immediate and the continuing increased risk of identity theft, identity fraud and medical fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation, (ii) invasion of privacy, (iii) breach of the confidentiality of

their PII/PHI, (iv) statutory damages under the California CMIA, (v) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, and/or (vi) the financial and temporal cost of monitoring their credit, monitoring their financial accounts, and mitigating their damages.

252.    Plaintiff, individually and for each member of the California Subclass, seeks nominal damages of one thousand dollars ($1,000) for each violation under Civil Code § 56.36(b)(1), and actual damages suffered, if any, pursuant to Civil Code § 56.36(b)(2), injunctive relief, as well as punitive damages of up to $3,000 per Plaintiff and each California Subclass members, and attorneys' fees, litigation expenses and court costs, pursuant to Civil Code § 56.35.

## COUNT VII
### Violation of the California Consumer Privacy Act ("CCPA")
### Cal. Civ. Code § 1798, *et seq.*
### (*On Behalf of Plaintiff and the California Subclass*)

253.    Plaintiff re-alleges and incorporates by reference paragraphs 1–165 as if fully set forth herein.

254.    Plaintiff brings this claim on her own behalf and on behalf of the California Subclass.

255.    The California Legislature has explained: "The unauthorized disclosure of personal information and the loss of privacy can have devasting effects for individuals, ranging from financial fraud, identity theft, and unnecessary costs to personal time and finances, to destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm."[50]

---

[50]  California Consumer Privacy Act (CCPA) Compliance, https://buyergenomics.com/ccpa-

256.    The CCPA imposes an affirmative duty on businesses that maintain personal information about California residents to implement and maintain reasonable security procedures and practices that are appropriate to the nature of the information collected. Defendant failed to implement such procedures which resulted in the Data Breach.

257.    Plaintiff and California Subclass members are "consumer[s]" as defined by Civ. Code § 1798.140(g) because they are "natural person[s] who [are] California resident[s], as defined in Section 17014 of Title 18 of the California Code of Regulations, as that section read on September 1, 2017."

258.    Defendant is a "business" as defined by Civ. Code § 1798.140(c) because Defendant:

    a.  is a "sole proprietorship, partnership, limited liability company, corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners";

    b.  "collects consumers' personal information, or on the behalf of which is collected and that alone, or jointly with others, determines the purposes and means of the processing of consumers' personal information";

    c.  does business in California; and

    d.  has annual gross revenues in excess of $25 million; annually buys, receives for the business' commercial purposes, sells or shares for commercial purposes, alone or in combination, the personal information of 50,000 or more consumers, households, or devices; or derives 50 percent

complience/.

or more of its annual revenues from selling consumers' personal information.

259.    The Private Information taken in the Data Breach is personal information as defined by Civil Code § 1798.81.5(d)(1)(A) because it contains Plaintiff's and California Subclass members' unencrypted first and last names in combination with one or more of the following data elements, with either the name or the data elements not encrypted or redacted: (1) Social security number, (2) medical information, or (3) health insurance information.

260.    Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard the California subclass's Private Information and that the risk of a data breach or theft was highly likely.

261.    Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the Private Information of Plaintiff and the California subclass. Specifically, Defendant subjected Plaintiff's and the California subclass's nonencrypted and nonredacted Private Information to an unauthorized access and exfiltration, theft, or disclosure as a result of the Defendant' violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information, as described herein.

262.    As a direct and proximate result of Defendant' violation of its duty, the unauthorized access and exfiltration, theft, or disclosure of Plaintiff's and Class Members' personal information included exfiltration, theft, or disclosure through Defendant' servers, systems, and website, and/or the dark web, where hackers further disclosed the personal identifying information alleged herein.

263.    As a direct and proximate result of Defendant's acts, Plaintiff and the California

subclass were injured and lost money or property, including but not limited to the loss of Plaintiff's and the subclass's legally protected interest in the confidentiality and privacy of their Private Information, stress, fear, and anxiety, nominal damages, and additional losses described above.

264.    Any type of demand made upon Defendant in advance of the litigation would not be curative, as the information compromised in the data breach is already in the hands of cybercriminals and its destruction (or return) cannot be assured.

265.    Section 1798.150(b) specifically provides that "[n]o [prefiling] notice shall be required prior to an individual consumer initiating an action solely for actual pecuniary damages." Accordingly, Plaintiff and the California subclass by way of this complaint seek actual pecuniary damages suffered as a result of Defendant' violations described herein. Plaintiff will issue a notice of these alleged violations pursuant to § 1798.150(b) and intends to amend this complaint to seek statutory damages and injunctive relief upon expiration of the 30-day cure period pursuant to § 1798(a)(1)(A)-(B), (a)(2), and (b).

**COUNT VIII**
**Violation of California Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code § 17200, *et seq*.**
**(*On Behalf of Plaintiff and the California Subclass*)**

266.    Plaintiff re-alleges and incorporates by reference paragraphs 1–165 as if fully set forth herein.

267.    Plaintiff brings this claim on her own behalf and on behalf of the California Subclass.

268.    Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

269.    Defendant violated Cal. Bus. & Prof. Code § 17200 et seq. ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

270. Defendant's "unfair" acts and practices include:

    a.  Defendant failed to implement and maintain reasonable security measures to protect Plaintiff's and California subclass members' Private Information from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of the Defendant data breach. Defendant failed to identify foreseeable security risks, remediate identified security risks, and adequately improve security following previous cybersecurity incidents and known coding vulnerabilities in the industry;

    b.  Defendant' failure to implement and maintain reasonable security measures also was contrary to legislatively-declared public policy that seeks to protect consumers' data and ensure that entities that are trusted with it use appropriate security measures. These policies are reflected in laws, including the FTC Act (15 U.S.C. § 45), California's Customer Records Act (Cal. Civ. Code § 1798.80 et seq.), and California's Consumer Privacy Act (Cal. Civ. Code § 1798.150);

    c.  Defendant's failure to implement and maintain reasonable security measures also led to substantial injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because consumers could not know of Defendant' inadequate security, consumers could not have reasonably avoided the harms that Defendant caused; and

    d.  Engaging in unlawful business practices by violating Cal. Civ. Code § 1798.82.

271.    Defendant have engaged in "unlawful" business practices by violating multiple laws, including California's Consumer Records Act, Cal. Civ. Code §§ 1798.81.5 (requiring reasonable data security measures) and 1798.82 (requiring timely breach notification), California's Consumer Privacy Act, Cal. Civ. Code § 1798.150, California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1780, et seq., the FTC Act, 15 U.S.C.§ 45, and California common law.

272.    Defendant's unlawful, unfair, and deceptive acts and practices include:

a.  Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and California subclass members' personal information, which was a direct and proximate cause of the Defendant data breach;

b.  Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Defendant's data breach;

c.  Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and California subclass members' personal information, including duties imposed by the FTC Act, 15 U.S.C. § 45, California's Customer Records Act, Cal. Civ. Code §§ 1798.80 et seq., and California's Consumer Privacy Act, Cal. Civ. Code § 1798.150, which was a direct and proximate cause of the Defendant's data breach;

d.  Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and California subclass members' Private Information,

including by implementing and maintaining reasonable security measures;

    e.   Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and California subclass members' personal information, including duties imposed by the FTC Act, 15 U.S.C. § 45, California's Customer Records Act, Cal. Civ. Code §§ 1798.80, et seq., and California's Consumer Privacy Act, Cal. Civ. Code § 1798.150;

    f.   Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and California subclass members' personal information; and

    g.   Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and California subclass members' personal information, including duties imposed by the FTC Act, 15 U.S.C. § 45, California's Customer Records Act, Cal. Civ. Code §§ 1798.80, et seq., and California's Consumer Privacy Act, Cal. Civ. Code § 1798.150.

273.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' personal information.

274.    As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent acts and practices, Plaintiff and California subclass members were injured and lost money or property, which would not have occurred but for the unfair and deceptive acts, practices, and omissions alleged herein, suffered monetary damages from fraud and identity theft, incurred time

and expenses related to monitoring their financial accounts for fraudulent activity, are at an increased, imminent risk of fraud and identity theft, and suffered a loss of value of their personal information.

275.    Defendant's violations were, and are, willful, deceptive, unfair, and unconscionable.

276.    Plaintiff and California subclass members have lost money and property as a result of Defendant's conduct in violation of the UCL, as stated herein and above.

277.    By deceptively storing, collecting, and disclosing their personal information, Defendant has taken money or property from Plaintiff and class members.

278.    Defendant acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded Plaintiff's and California subclass members' rights. Past data breaches put it on notice that its security and privacy protections were inadequate.

279.    Plaintiff and California subclass members seek all monetary and nonmonetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices or use of their personal information; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief, including public injunctive relief.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

a)    For an Order certifying this action as a Class action and appointing Plaintiff as Class Representative and her counsel as Class Counsel;

b)    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members'

Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

c)      For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d)      For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

e)      Ordering Defendant to pay for not less than five years of credit monitoring services for Plaintiff and the Class;

f)      For an award of actual damages, compensatory damages, statutory damages, nominal damages, statutory penalties, and other damages the Court deems appropriate, in an amount to be determined, as allowable by law;

g)      For an award of punitive damages, as allowable by law;

h)      For an award of attorneys' fees and costs, pursuant to O.C.G.A. § 13- 6-11, and any other expense, including expert witness fees, as permitted by law;

i)      Pre- and post-judgment interest on any amounts awarded; and,

j)      Such other and further relief as this court may deem just and proper.

## **JURY TRIAL DEMANDED**

Under Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: June 21, 2023

Respectfully Submitted,

_s/ Casey L. Hinkle_
Casey L. Hinkle
KAPLAN JOHNSON ABATE & BIRD LLP
710 W. Main St., 4th Floor
Louisville, Kentucky 40202
Tel:    502.416.1636
chinkle@kaplanjohnsonlaw.com

Lawrence L. Jones II
JONES WARD PLC
445 Baxter Avenue, Suite 275
Louisville, Kentucky 40204
Tel.    502.882.6000
larry@jonesward.com

James J. Pizzirusso*
Amanda V. Boltax*
HAUSFELD LLP
888 16th Street N.W.
Suite 300
Washington, D.C. 20006
Tel.    202.540.7200
jpizzirusso@hausfeld.com
mboltax@hausfeld.com

Steven M. Nathan*
HAUSFELD LLP
33 Whitehall Street
Fourteenth Floor
New York, NY 10004
Tel.    646.357.1100
snathan@hausfeld.com

Kim D. Stephens, P.S.*
Cecily C. Jordan*
TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101-3147
Tel.    206.682.5600
Fax.    206.682.2992
kstephens@tousley.com
cjordan@tousley.com

Amy Keller*
DICELLO LEVITT LLP
Ten North Dearborn Street
Sixth Floor
Chicago, Illinois 60602
Tel.     312.214.7900
akeller@dicellolevitt.com

David A. Straite*
DICELLO LEVITT LLP
485 Lexinton Avenue
Suite 1001
New York, New York 10017
Tel.     646.933.1000
dstraite@dicellolevitt.com

*Counsel for Plaintiff*

*Motions for Admission Pro Have Vice Forthcoming*